24 P.3d 430 (2001)
106 Wash.App. 532
STATE of Washington, Respondent,
v.
Justin R. JENNINGS, Appellant.
No. 25894-3-II.
Court of Appeals of Washington, Division 2.
May 4, 2001.
Publication Ordered June 1, 2001.
*432 John Henry Browne, Browne & Ressler, Seattle, for Appellant.
Carol L. Case, Deputy Pros. Atty., Shelton, for Respondent.

*431 OPINION
HUNT, J.
Justin Jennings appeals his exceptional sentence for the rape and torture of his 13-day-old daughter. He argues that he should be allowed to withdraw his guilty plea to two counts of first degree assault of a child (RCW 9A.36.120) because at sentencing, the court erroneously referenced a standard range higher than the correct standard range listed on his Statement of Defendant in Plea of Guilty.
Because there was no plea agreement breach, we affirm Jennings' guilty plea convictions. But because we cannot say from the record that the trial court would have imposed the same exceptional sentence had it referenced the correct standard range, we remand for resentencing.

FACTS

I. THE CRIMES
On September 30, 1999, Jennings and S.T. brought their 13-day-old baby daughter, L.T.,[1] to the hospital for examination of "possible sepsis and pneumonia." Hospital officials *433 notified police that the injuries were "possibly caused as a result of child abuse," and the staff conducted a thorough exam of baby L.T. Medical scanning equipment revealed "a probable skull fracture, pleural fluid, air space disease, an abdominal mass or hemorrhage within the abdomen, plus an abnormal appearance of the pelvis and possible fluid within the pelvic region."

II. INVESTIGATION
Law enforcement officials contacted Jennings and S.T. and advised them that "because of the nature of the injuries, law enforcement would be investigating the incident." According to investigators, Jennings initially stated that the injuries "could have been caused while the child sleep [sic] with him and his wife." Supplemental Clerk's Papers at 69.
On October 5, 1999, police interviewed Jennings and S.T. After advising them that they were not under arrest and that they were free to leave at anytime, the police conducted a Voice Stress Test to help determine what had happened to L.T. Based on the test, investigators concluded that: (1) S.T. had no involvement or knowledge of who had injured L.T.; and (2) Jennings was being deceptive during the first portion of the interview and test. Jennings then stated that he had tripped and stumbled while carrying L.T., she hit her head on a counter-top, and then she fell to the floor with Jennings landing on top of her.
Investigators contacted the hospital, consulted with the staff, concluded that Jennings' story was not consistent with L.T.'s injuries, and so advised Jennings. Jennings then described what had really happened:
Jennings said he hit his daughter on the side of the head, with and [sic] open hand. Jennings then stated that he also hit her a couple of times in the stomach and picked her up by her leg and threw her several feet onto a couch in the residence. I then asked Jennings when this occurred and he stated that the hitting occurred at approx. midnight, while S.T. was asleep and the picking up by the leg and throwing her to the couch happened about 1930 hrs, while S.T. was in the shower.
Jennings then stated that during the midnight incident he also used a white plastic spoon to stab into L.T.'s vagina and rectum. Jennings continued to say that he then injected lamp oil into his daughter[']s IV Shunt using a syringe that was supposed to be used for her injections to treat the infection that she had been under treatment for during her first hospitalization.
Supplemental Clerk's Papers at 70-71.

III. GUILTY PLEA
The State charged Jennings with two counts of first degree assault of a child as follows:

Count I
That said defendant, JUSTIN R. JENNINGS, in the County of Mason, State of Washington, on or about the 29th day of September, 1999, did commit ASSAULT OF A CHILD IN THE FIRST DEGREE, in that said defendant being eighteen years of age or older and with intent to inflict great bodily harm upon the person of L.T., a child under the age of thirteen, (a) committed the crime of assault in the first degree, as defined in RCW 9A.36.011, against the child in that the defendant fractured the skull and tibia of the victim and the defendant inserted lamp oil into the vein of the victim causing severe metabolic acidosis contrary to RCW 9A.36.120 and against the peace and dignity of the State of Washington.

Count II
That said defendant, JUSTIN R. JENNINGS, in the County of Mason, State of Washington, on or about the 29th day of September, 1999, did commit ASSAULT OF A CHILD IN THE FIRST DEGREE, in that said defendant being eighteen years of age or older and with intent to inflict great bodily harm upon the person of L.T., a child under the age of thirteen, committed the crime of assault in the first degree, as defined in RCW 9A.36.011, against the child and intentionally assaulted the child by committing the crime of Rape of a *434 Child in the First Degree by inserting a spoon into the rectum and vagina of the victim thereby causing the child physical pain or agony that is equivalent to what is produced by torture contrary to RCW 9A.36.120 and against the peace and dignity of the State of Washington.
Clerk's Papers at 74-75.
Jennings pled guilty and signed a Statement of Defendant on Plea of Guilty, in which he stated:
On or about September 29, 1999, when I was 18 years old, I fractured the skull and tibia of L.T. while she was less than 13 years old and inserted lamp oil into L.T.'s veins causing severe metabolic acidosis. I also, with intent to inflict great bodily harm against L.T., intentionally assaulted her by inserting a spoon into her rectum and vagina thereby causing pain or agony equivalent to torture. Both acts occurred in Mason County, Washington.
Clerk's Papers at 72.
The court discussed with Jennings the charges he was admitting, the implications of his guilty plea, and the colloquy among the court, the defendant, and the prosecutor:
THE COURT: The maximum possible penalty for each of these counts is up to life in prison, and a Fifty Thousand Dollar fine. Were you aware of the maximum penalty?
MR. JENNINGS: Yes, Your Honor.
THE COURT: There is also said to be a standard range ... is that ninety-three to a hundred and twenty-three months on each count?
[PROSECUTOR]: Yes, Your Honor.
THE COURT: And there are no enhancements?
[PROSECUTOR]: That's correct.
Report of Proceedings at 8. The court specifically questioned Jennings to be sure that he understood that the State was making no promise about what sentence it would ultimately recommend:
THE COURT: On page three there is a place on the form for the prosecuting attorney to make a promise of recommendation to the court regarding sentencing, and there is no promise stated there, and that's how the State is going forward, correct?
[PROSECUTOR]: There is no agreement as to what either side will recommend at this time. We will reserve it until the sentencing date.
THE COURT: Mr. Jennings, when your case does come back before the court for sentencing there will be a number of recommendations made to the court about what the right sentence will be for you. You need to understand that the court does not have to follow any of those recommendations. Is that understood?
MR. JENNINGS: Yes, Your Honor.
THE COURT: Now I did tell you what the standard range was, and it is basically presumed on each offense by the Legislature that a person will be sentenced within the standard range, but that is not always the case. If there are good and compelling reasons to do otherwise, the court can give you an exceptional sentence, which is either below the standard range or above the standard range, and that, again, is based upon good and compelling reasons to do that.
If that were to happen, if you were to be given an exceptional sentence, you could appeal from that portion of your case. Do you understand your right to appeal on an exceptional sentence?
MR. JENNINGS: Yes, Your Honor.
Report of Proceedings at 11-12 (emphasis added).

IV. SENTENCING
On April 13, 2000, the trial court conducted a sentencing hearing. The Department of Corrections (DOC) Standard Pre Sentence Investigation recommended an exceptional sentence of 240 months for each count due to the deliberate cruelty to L.T., her vulnerability as a newborn infant, and the domestic violence. The prosecutor initially recommended thirty years confinement; but he also added, "On the other hand, if the court imposed sixty years I would totally understand it as an appropriate sentence." Testifying were S.T. and L.T.'s attorney, who stated, "I think that the recommendation for forty years, frankly, is not enough, because I *435 ask myself, how long will L.T. be alive? ... I don't think that there is any question that this young man should serve at least fifty years."
Jennings argued for a standard range sentence, contending that he had not been evasive with investigating authorities,[2] he was remorseful for what happened,[3] and the prosecutor's recommendation was excessive when compared with the standard range for first degree murder.
The court referenced a standard range of 120 to 160 months, mentioned doubling the lower end, and then imposed exceptional sentences of 240 months for each count, to run consecutively:
As I have said, I don't think that there is any magic in that type of formula, and I think that actually insofar as appropriate protection for our society, and in sending an appropriate message to the rest of society with respect to the consequences that may be expected in a case of this nature, that the four hundred and eighty months requested is appropriate.
I am going to impose an exceptional sentence, finding that the crimes committed by this young man are truly aggravated in that he deliberately and cruelly inflicted the crimes, or inflicted the crimes with deliberate cruelty, in excess of that which would be anticipated in a standard crime of Assault of a Child in the First Degree.
Further, he violated the trust which this child had the right to have in him as a parent of this approximately two week old baby, and in doing so compels the court to impose the exceptional sentence of four hundred and eighty months.
Report of Proceedings at 46-47.

ANALYSIS

I. GUILTY PLEA
Jennings argues that he should have been allowed either to enforce the standard range sentence (93 to 123 months) listed in the guilty plea agreement or to withdraw his guilty plea. Although he correctly recites that a guilty plea is not valid unless the defendant understands the sentencing consequences of his plea, the record does not support his argument. Here, there was no plea agreement as to the State's sentence recommendation at the time Jennings entered his plea of guilty; and the trial court specifically pointed this out to Jennings before accepting his plea. Nor was Jennings in any way misinformed about the consequences of his plea.[4]
*436 As Jennings asserts, he "entered his plea with the understanding that the standard range for each of his sentences was 93 to 123 months," which was the correct standard range. Where the sentencing court used the wrong standard range, the remedy is not withdrawal of the plea,[5] but rather, as explained below, resentencing. The trial court did not err in denying Jennings' request to withdraw his guilty plea.

II. OFFENDER SCORE

A. MISCALCULATION
We review a sentencing court's offender score calculation de novo. State v. Mitchell, 81 Wash.App. 387, 914 P.2d 771 (1996); State v. McCraw, 127 Wash.2d 281, 898 P.2d 838 (1995); State v. Roche, 75 Wash. App. 500, 878 P.2d 497 (1994). The general rule is that a sentencing court acts without statutory authority when imposing a sentence based on a miscalculated offender score. Matter of Johnson, 131 Wash.2d 558, 933 P.2d 1019 (1997):
A sentencing court acts without statutory authority under the Sentencing Reform Act of 1981 when it imposes a sentence based on a miscalculated offender score. State v. Roche, 75 Wash.App. 500, 513, 878 P.2d 497 (1994); State v. Brown, 60 Wash. App. 60, 70, 802 P.2d 803 (1990), review denied, 116 Wash.2d 1025, 812 P.2d 103 (1991), overruled on other grounds by State v. Chadderton, 119 Wash.2d 390, 832 P.2d 481 (1992).
Johnson, 131 Wash.2d at 568, 933 P.2d 1019.
The State explains that the trial court sentenced Jennings to an exceptional sentence at either "twice the low end of the [incorrect] 120 to 160 month range on each count or slightly less than double the high end of the correct range of 93 to 123 months on each count." But the State concedes that the sentencing court incorrectly applied an offender score of three instead of the correct offender score of zero.
B. RECORD UNCLEAR AS TO WHETHER TRIAL COURT WOULD HAVE IMPOSED SAME EXCEPTIONAL SENTENCE IF OFFENDER SCORE WAS CORRECTLY CALCULATED
An appellate court may uphold an exceptional sentence, despite an incorrectly calculated offender score, when the record demonstrates that the trial court would have applied the same exceptional sentence even had the offender score been calculated correctly. In State v. Parker, 132 Wash.2d 182, 189, 937 P.2d 575 (1997), the Supreme Court overruled a line of cases, including State v. Thomas, 57 Wash.App. 403, 410, 788 P.2d 24 (1990), in which the appellate court affirmed an exceptional sentence even though the trial court had incorrectly calculated the offender score.
Although the Thomas court concluded that "the erroneous offender score did not affect the exceptional sentence," Thomas, 57 Wash. App. at 411, 788 P.2d 24, the Supreme Court deemed this conclusion improper:
We are hesitant to affirm an exceptional sentence where the standard range has been incorrectly calculated because of the great likelihood that the judge relied, at least in part, on the incorrect standard ranges in his calculus. Affirming such would uphold a sentence which the sentencing judge might not have imposed given correct information and would defeat the purpose of the [Sentencing Reform Act].
*437 We note the Court of Appeals took the opposite approach in State v. Thomas, 57 Wash.App. 403, 411, 788 P.2d 24 ("erroneous offender score did not affect the exceptional sentence"), review denied, 115 Wash.2d 1003, [795 P.2d 1155], (1990); State v. Altum, 47 Wash.App. 495, 735 P.2d 1356, review denied, 108 Wash.2d 1024 (1987); and State v. Hernandez, 48 Wash.App. 751, 754, 740 P.2d 374, review denied, 109 Wash.2d 1020 (1987). To the extent Thomas, Altum, and Hernandez conflict with the our [sic] ruling today, they are overruled.
Parker, 132 Wash.2d at 190, 937 P.2d 575.
Parker goes on to hold:
When the sentencing court incorrectly calculates the standard range before imposing an exceptional sentence, remand is the remedy unless the record clearly indicates the sentencing court would have imposed the same sentence anyway. See, e.g., State v. Brown, 60 Wash.App. [60,] 70, 802 P.2d 803 [ (1990) ] ("This court cannot say that the much lower standard range would not have an impact on the amount of time given for the exceptional sentence" and therefore remand for resentencing is required.)
Parker, 132 Wash.2d at 189, 937 P.2d 575 (emphasis added).
Here, the record strongly suggests that the trial court would have applied the same exceptional sentence even if the correct offender score had been referenced: The trial court imposed the same exceptional sentence that the Department of Corrections (DOC) recommended, which did use the correct offender score; and the trial court emphasized the extreme cruelty and abuse of trust of Jennings' crimes imposed, independent of Jennings' offender score.
But Parker requires the record to show clearly that the trial court would have imposed the same exceptional sentence if it had used the correct offender score. And here, the trial court specifically referenced the incorrect, higher standard range, making the otherwise probable sentence somewhat less than clear if the trial court had referenced the correct standard range. Parker, 132 Wash.2d at 189, 937 P.2d 575. Therefore, as the State concedes, Parker mandates a remand for resentencing with reference to the correct standard range. Parker, 132 Wash.2d at 189, 937 P.2d 575.
Because on resentencing, the trial court may choose to impose the same or similar exceptional sentence, and because Jennings has challenged the court's justification for an exceptional sentence, we next resolve those issues.

III. EXCEPTIONAL SENTENCE

A. EXCEPTIONAL SENTENCE STATUTE
The Sentencing Reform Act (SRA) provides for exceptional sentences, in pertinent part, as follows:
The following are illustrative factors which the court may consider in the exercise of its discretion to impose an exceptional sentence. The following are illustrative only and are not intended to be exclusive reasons for exceptional sentences.
....
(2) Aggravating Circumstances
(a) The defendant's conduct during the commission of the current offense manifested deliberate cruelty to the victim.
(b) The defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance due to extreme youth,[6] advanced age, disability, or ill health.
....
(d) The current offense was a major economic offense or series of offenses, so identified by a consideration of any of the following factors:
....

*438 (iv) The defendant used his or her position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense.[7]
....
(h) The current offense involved domestic violence, as defined in RCW 10.99.020, and one or more of the following was present:
(i) The offense was part of an ongoing pattern of psychological, physical, or sexual abuse of the victim manifested by multiple incidents over a prolonged period of time;
....
(iii) The offender's conduct during the commission of the current offense manifested deliberate cruelty or intimidation of the victim.
(i) The operation of the multiple offense policy of RCW 9.94A.400 results in a presumptive sentence that is clearly too lenient in light of the purpose of this chapter, as expressed in RCW 9.94A.010.
RCW 9.94A.390(2) (emphasis added).

B. STANDARD OF REVIEW
The Supreme Court recently outlined the standard of review for exceptional sentences:
Review of a court's imposition of an exceptional sentence is governed by RCW 9.94A.210(4). An appellate court determines the appropriateness of an exceptional sentence by answering three questions under RCW 9.94A.210(4): (1) whether the reasons given by the sentencing judge are supported by evidence in the record, under the clearly erroneous standard of review; (2) whether the reasons justify a departure from the standard range, under de novo review, as a matter of law; or (3) whether the sentence is clearly too excessive or too lenient, under the abuse of discretion standard of review.
State v. Ferguson, 142 Wash.2d 631, 646, 15 P.3d 1271, 1279 (2001) (footnotes and citations omitted). We examine each factor in turn.

1. RECORD SUPPORTS TRIAL COURT'S REASONS
The sentencing court's Findings of Fact and Conclusions of Law list the following reasons for imposing the exceptional sentence on Jennings:
1. The crimes against the victim were an abuse of a position of trust, the defendant being the father of the victim who was between 13-16 days old at the time of the assaults.
2. The crimes against the victim involved the infliction of injury +/or pain to the victim by the defendant through deliberate cruelty; to wit: insertion of a spoon into the vagina and anus of his approximately two-week old baby daughter until she frothed at the mouth, and further, to-wit: injecting a foreign substance (lamp oil) into his baby daughter's veins.
Clerk's Papers at 11 (emphasis added). The trial court noted that the DOC Pre Sentence Investigation recommended an exceptional sentence of 480 months, based on a correct offender score of zero, that enumerated aggravating factors justifying an exceptional sentence similar to those the trial court found.[8]

*439 a. Abuse of TrustVulnerable Newborn
The trial court based the exceptional sentence, in part, on Jennings' abuse of a position of trust as the father of a newborn baby. Jennings argues that abuse of trust cannot be an aggravating factor because "[h]is daughter was too young to be manipulated through a trust relationship" Brief of Appellant at 11 and "there was no trust relationship between [him] and his days-old daughter used to facilitate the assaults." Brief of Appellant at 12. We disagree. As the trial court aptly noted, one of the most critical trust relationships is that between a parent and a newborn infant, regardless of whether the infant is measurably conscious of that trust.
Neither State v. Grewe, 117 Wash.2d 211, 813 P.2d 1238 (1991), nor the other cases Jennings cites, support his proposition that he had no trust relationship with baby L.T. On the contrary, Grewe rejects the same argument that Jennings makes here:
Our conclusion is consistent with previous decisions from the Court of Appeals. While we have considered the evidence necessary to establish a position of trust only once, the Court of Appeals has considered the question several times....
.... The most significant of these cases for our purposes is State v. Brown, 60 Wash.App. 60, 802 P.2d 803 (1990), review denied, 116 Wash.2d 1025, [812 P.2d 103] (1991). Brown involved review of an assault conviction sentence in which the Court of Appeals refused to find a sufficient relationship of trust between an 11 year old boy and his father.... [T]he court concluded the only position of trust relevant to exceptional sentences in crimes perpetrated by adults against children is that between the perpetrator and the primary care giver who entrusts the child's care to the perpetrator, not the trust relationship between the child victim and the perpetrator. We disagree.
While we share the Court of Appeals' belief not every crime committed by a parent against a child involves an abuse of a position of trust, we do not approve of the court's exclusive focus on the trust between the primary care giver and the adult perpetrator. Although the trust between the primary care giver and the perpetrator may also give rise to a trust relationship subject to abuse, that relationship is secondary to the trust between the perpetrator and the child victim. It is the trust between the perpetrator and the victim which renders the victim particularly vulnerable to the crime. See State v. Shephard, 53 Wash.App. 194, 199, 766 P.2d 467 (1988) (discussed in Brown, 60 Wash. App. at 75, [802 P.2d 803]).
Grewe, 117 Wash.2d at 219-220, 813 P.2d 1238 (Emphasis added).[9]
In assessing abuse of trust, the Supreme Court in Grewe focused not only on the trust between the perpetrator and the victim, but also on the victim's heightened vulnerability. Similarly, although the sentencing court here did not expressly include the victim's extreme vulnerability as a separate, aggravating factor, it, like the Supreme Court in Grewe, intertwined newborn L.T.'s vulnerability with her father's abuse of trust:
Probably the majority of us sitting in this room have had the great joy and difficult task of being parents, and as such we havemany of us had occasion to sit with a thirteen, fourteen, fifteen day old baby in our arms and look at that baby and realize just how vulnerable our species is at birth, and realize just how dependent they are upon those around themthe adults that live in their lives.
....
[W]e had an individual who was in an absolute position of trust ... a parent in charge and caring for this minor childI can think of no higher trust ....
Report of Proceedings at 41 and 44. (Emphasis added).
In State v. Overvold, 64 Wash.App. 440, 446, 825 P.2d 729 (1992), Division One directly *440 addressed the inter-relationship between vulnerability[10] and abuse of trust in a parent-child crime and held that the parental relationship establishes a position of trust:
[W]hile Overvold's position as the victim's father does not require a finding that the victim was particularly vulnerable, the relationship between C and her father here was sufficient to establish a separate ground for an exceptional sentence based on the defendant's abuse of a position of trust. State v. Fisher, 108 Wash.2d 419, 427, 739 P.2d 683 (1987) ("A relationship extending over a longer period of time, or one within the same household, would indicate a more significant trust relationship, such that the offender's abuse of that relationship would be a more substantial reason for imposing an exceptional sentence.")
Overvold, 64 Wash.App. at 447, 825 P.2d 729.
Jennings' assault on L.T. similarly involved both an abuse of trust and a vulnerable newborn victim, two interrelated aggravating factors separately listed under the Sentencing Reform Act. RCW 9.94A.390(2)(d)(iv) and (b), respectively. Here, the record clearly shows that Jennings used his position of trust as a father, while he was alone with L.T., to facilitate and to commit his assaults on his extremely vulnerable infant daughter. While L.T.'s mother was in another room taking a shower and napping, L.T. was in Jennings' exclusive care; it was then that he assaulted and raped their newborn daughter, unbeknownst to the mother.

b. Deliberate Cruelty
"Deliberate cruelty is gratuitous violence or other conduct that inflicts physical, psychological, or emotional pain as an end in itself." State v. Smith, 82 Wash.App. 153, 162, 916 P.2d 960 (1996), citing State v. Scott, 72 Wash.App. 207, 214, 866 P.2d 1258 (1993). To constitute a legal justification for imposing an exceptional sentence, the deliberate cruelty must be atypical of the crime. State v. Delarosa-Flores, 59 Wash.App. 514, 518, 799 P.2d 736 (1990); RCW 9.94A.120(2).
Here, substantial evidence supports the sentencing court's finding of deliberate, atypical cruelty. In imposing an exceptional sentence, the court found deliberate cruelty when Jennings (i) injected lamp oil into L.T.'s veins (Count I, first degree child assault, lamp oil injection; skull and tibia fractures) and (ii) inserted a "spoon into [L.T.'s] vagina and anus" (Count II, first degree assault/rape of a child).

i. Injection of Lamp Oil
Jennings claims that Count I, charged as an "assault committed with the intent to commit great bodily harm," subsumes the injection of L.T. with lamp oil and, thus, the lamp oil injection cannot be used as an aggravating factor to support an exceptional sentence beyond the standard range. We disagree. The record supports the trial court's findings that "injecting a foreign substance (lamp oil) into his baby daughter's veins" is an extraordinary, aggravating factor justifying an exceptional sentence. Clerk's Papers at 11.
Count I charged Jennings with "assault in the first degree, as defined in RCW 9A.36.011, against the child in that the defendant fractured the skull and tibia of the victim and the defendant inserted lamp oil into the vein of the victim causing severe metabolic acidosis contrary to RCW 9A.36.120."[11] (Emphasis added.) Under Count I, fracturing L.T.'s skull and tibia *441 established the basic elements of first degree assault of a child. The lamp oil that Jennings injected into L.T.'s veins was not only in addition to the broken bones, but also significantly more egregious and atypical of reported cases where an assault occurs by injection.[12] It caused infant L.T. to have life-threatening,[13] severe, metabolic acidosis.[14]
RCW 9.94A.010(1) sets forth one purpose of the Sentencing Reform Act as follows:
The purpose of this chapter is to make the criminal justice system accountable to the public by developing a system for the sentencing of felony offenders which structures, but does not eliminate, discretionary decisions affecting sentences, and to:
(1) Ensure that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history....
(Emphasis added.)
"Public policy and the Sentencing Reform Act require full punishment for each offense." State v. Coats, 84 Wash.App. 623, 628, 929 P.2d 507 (1997). "An exceptional sentence is justified when a defendant's multiple current offenses and high offender score results in some crimes going unpunished." Coats, 84 Wash.App. at 628, 929 P.2d 507,[15] citing State v. Stephens, 116 Wash.2d 238, 246, 803 P.2d 319 (1991) (emphasis added). The infliction of multiple injuries can support an exceptional sentence only where the multiple injuries were caused by multiple acts.[16]
Here, within Count I alone, Jennings engaged in multiple acts inflicting multiple injuries to baby L.T. (fracturing skull and tibia and injecting lamp oil into L.T.'s veins to a life-threatening extent). Thus, a standard range sentence for the skull and tibia fractures alone would have allowed the deliberately cruel lamp-oil injection to go unpunished, contrary to RCW 9.94A.010(1).

*442 ii. Atypically Egregious Rapes[17]
These rapes involved more gratuitous violence than the initial acts of penetration themselves. First, although combined in a single count, Count II, Jennings raped his infant daughter twice, once anally and once vaginally, thus, justifying additional punishment:
Repeated acts of forcible sexual intercourse are not to be construed as a roll of thunder, an echo of a single sound rebounding until attenuated. One should not be allowed to take advantage of the fact that he has already committed one sexual assault on the victim and thereby be permitted to commit further assaults on the same person with no risk of further punishment for each assault committed.
State v. Tili, 139 Wash.2d 107, 117, 985 P.2d 365 (1999), quoting Harrell v. State, 88 Wis.2d 546, 277 N.W.2d 462, 469 (1979).
Second, Jennings' acts involved deliberate, exceptional cruelty beyond the multiple acts of penetration. Once Jennings penetrated L.T.'s "vagina or anus, however slight, by an object," he completed the crime of first degree rape of a child. But his "stabbing" of the spoon farther into L.T.'s orifices, until she frothed at the mouth, surpassed the initial acts of penetration necessary to establish a prima facie case and was more egregious than that typically associated with the crime. See State v. Cardenas, 129 Wash.2d 1, 7-8, 914 P.2d 57 (1996).
This case is analogous to Smith, 82 Wash. App. 153, 916 P.2d 960, in that the trial court relied on multiple factors in upholding a finding of deliberate cruelty. In finding that Jennings assaulted L.T. with deliberate cruelty, justifying an exceptional sentence, the trial court stated:
I can't think of anything more deliberately cruel than that type of action. The frustration that the parent might feel, where you see a shaking baby syndrome I think most of us that have had children have been at the point where our child has cried and cried and cried and we said, oh my goodness, what can I do? And you can kind of understand how that could happen, especially with young people who haven't had a background in child care. But the actions that this young man, that Justin Jennings inflicted upon this baby goes so far beyond thatso far beyond thatthe deliberate injection of lamp oil into her blood stream, the insertion of the spoon into that child's body until the child frothed in pain.
I cannot, in good conscious, impose a standard range sentence in this case.
Report of Proceedings at 45.
The record supports the trial court's findings of abuse of trust and deliberate cruelty for both counts. The trial court's findings on these two aggravating factors were not clearly erroneous. Ferguson, 142 Wash.2d at 647, 15 P.3d 1271.

2. DEPARTURE FROM THE STANDARD RANGE
The SRA provides guidelines for departure from standard range sentences.[18] RCW 9.94A.390. We review the trial court's reasons for such departures de novo. Ferguson, 142 Wash.2d at 646, 15 P.3d 1271.
In determining whether a factor legally supports departure from the standard sentencing range set by the SRA, we employ a two-part test: (1) The trial court may not base an exceptional sentence on factors the Legislature necessarily considered in establishing the standard sentencing range; and *443 (2) the aggravating factor must be sufficiently substantial and compelling to distinguish the crime in question from others in the same category. State v. Ha'mim, 132 Wash.2d 834, 940 P.2d 633 (1997).

a. Deliberate Cruelty Not Subsumed in Charged Crimes
Jennings argues that the sentencing court incorrectly used deliberate cruelty as an aggravating factor because the underlying acts already constituted an element of the charged crimes, punishable by a standard range sentence. Jennings is correct that, in applying the SRA, the aggravating factors cited by a court for imposing an exceptional sentence cannot be a "mere reference to the very facts which constituted the elements of the offense proven at trial." Ferguson, 142 Wash.2d at 648, 15 P.3d 1271.
`[F]actors inherent in the crimeinherent in the sense that they were necessarily considered by the Legislature (in establishing the standard sentence range for the offense) and do not distinguish the defendant's behavior from that inherent in all crimes of that typemay not be relied upon to justify an exceptional sentence....' An element of the charged offense may not be used to justify an exceptional sentence. An exceptional sentence is not justified by mere reference to the very facts which constituted the elements of the offense proven at trial.
Ferguson, 142 Wash.2d at 647-48, 15 P.3d 1271 (footnotes and citations omitted). But such is not the case here.
Jennings engaged in conduct far more egregious than that necessary to satisfy the basic elements of two counts of first degree assault of a child. Here, within each charged count, there are multiple acts and multiple statutory bases upon which the State alleged Jennings committed the assaults.[19]

b. Abuse of Trust
Jennings also contends that there was no abuse of trust to justify departure from the standard range. We upheld the trial court's finding of an abuse of trust in section III(B)(1)(a) of this opinion, supra.
Not only did Jennings' deliberate cruelty significantly exceed that typical of the basic charged crimes, but also a standard range sentence would have been "clearly too lenient" for these multiple, cruel acts involving an egregious abuse of trust. See RCW 9.94A.010, RCW 9.94A.390(2)(i); Coats, 84 Wash.App. at 628, 929 P.2d 507. We hold that both Jennings' abuse of trust and/or his deliberate cruelty to infant L.T. justified the trial court's departure from the standard range as a matter of law. Ferguson, 142 Wash.2d at 649, 15 P.3d 1271.

3. EXCEPTIONAL SENTENCE NOT EXCESSIVE
We review for abuse of discretion whether the sentence is clearly too excessive. Ferguson, 142 Wash.2d at 651, 15 P.3d 1271. Here, the sentencing court extensively explained its reasons for imposing an exceptional sentence. At one point the trial court noted that it found Jennings' crimes so abhorrent and extraordinary that it compared the standard ranges for first degree murder and Jennings' assaults on L.T.:
[C]ounsel argues that Your Honor, you need to consider the fact that in a Murder in the First Degree, which is premeditated murder for those persons present who are not familiar with the term, and a zero offender score, would be a standard range of two hundred and forty to three hundred and twenty monthsby the way, counsel so we are essentially looking at the same standard range if we are looking at the back to back or consecutive sentencing in this case as you would in a Murder in the First Degree.

*444 And counsel says, certainly the court needs to understand and apply the concept that somebody takes a life should not be more culpable than somebody who-that inflicts this type of pain but does not take the life. The reality is, however, that if you were to deal with a death that had been inflicted in the fashion that this death would have been inflicted if the baby had died, the prosecution would be in here arguing for an exceptional sentence, and they would be arguing for an exceptional sentence for the same reasons that an exceptional sentence is argued for in this case, and that is, of course, that we had an individual who was in an absolute position of trust ... a parent in charge and caring for this minor childI can think of no higher trust, as I have indicated previously. And so we have a violation of trust. We know that is one of the aspects of the sentencing law that we are to take into consideration as sentencing judges.
Report of Proceedings at 43-44.
We hold that the sentence the trial court imposed was not clearly excessive. There were multiple aggravating factors: (1) L.T. was a vulnerable victim, only 13 days old when Jennings assaulted her; (2) Jennings abused the trust of parenting an infant child; (3) the object he used to rape L.T. was atypical of child, especially infant, rapes; (4) he raped L.T. multiple times, until she frothed at the mouth; and (5) he injected lamp oil into L.T.'s veins to the point of inducing severe metabolic acidosis, atypical of poisoning by injection. These aggravating factors are in addition to the "basic" assaults of "fracturing L.T.'s skull and tibia" and the prima facie act of rape. Considering all these circumstances, we cannot say that the trial court abused its discretion by imposing the exceptional sentences. Ferguson, 142 Wash.2d at 646, 15 P.3d 1271.
We affirm Jennings' convictions and remand the case for resentencing.
We concur: BRIDGEWATER, J., and ARMSTRONG, C.J.
NOTES
[1] Throughout this opinion, initials are used instead of names for the victim and the victim's mother.
[2] Defense counsel claimed that "Mr. Jennings, from day one, was willing to admit his involvement and his in these very heinous offenses...." But the investigating police agency report shows that Jennings initially claimed the injuries were accidental. After having presented two stories about how L.T. was injured accidentally, Jennings admitted having committed the crimes only after police confronted him six days later with the information that L.T.'s injuries were inconsistent with his claim of accidentally tripping and L.T. falling. Supplemental Clerk's Papers at 70.
[3] Jennings displayed scant understanding of remorse for the crimes. At sentencing, defense counsel presented the March 11, 2000, report of John Powell Ph.D., who had conducted a neuropsychological evaluation of Jennings. The report stated, "Mr. Jennings feels extremely guilty and remorseful about his behavior, a factor which is key in assessing his potential for treatment." Clerk's Papers at 27. In contrast, the April 7, 2000, DOC Standard Pre-Sentence Investigation report a month later indicates,

Mr. Jennings showed very little remorse in regards to the assault. He could not understand why the Court might order him to have no contact with the victim for life. He said, `She will not remember what happened. She's doing fine and no long term damage has been done, and she will not know what happened unless someone tells her.'
Clerk's Papers at 20.
Further, the DOC report indicates that, starting at the age of ten when his sister was born, Jennings
started torturing and mutilating his pet hamsters. He stated that he would have an overwhelming compulsion to conduct the same acts of torture that he performed on the victim. He stated that he would then realize that he had a "bloody mess in his lap" and became very disgusted and remorseful.... In regards to the victim, Mr. Jennings stated that the same compulsion came over him the day of the assault.
Clerk's Papers at 20.
[4] Jennings cites State v. Miller, 110 Wash.2d 528, 531, 756 P.2d 122 (1988). Miller involved a plea bargain between Miller and the prosecutor, under which "[t]he terms of the plea agreement specified that Miller would be free to argue his sentencing, including recommending an exceptional sentence of less than 20 years." Miller, 110 Wash.2d at 529, 756 P.2d 122. Both the prosecution and Miller's trial attorney were misinformed, since state law provided a mandatory minimum 20-year sentence. Because Miller had entered his plea based on his misunderstanding of the true, mandatory sentencing consequences, the Miller court held that it was error for the trial court to deny his motion to withdraw his guilty plea. Miller, 110 Wash.2d at 538, 756 P.2d 122. Unlike Miller, here there was no plea bargain between Jennings and the State.
[5] Respondent's Brief states that the State has "does not object if Jennings wants to withdraw his plea and be resentenced using the standard range of 93 to 123 months." But the rest of the brief argues convincingly against withdrawal of the plea. At oral argument, the State explained this apparent contradiction as underscoring its concession that resentencing is required, but not withdrawal of the plea.
[6] The courts have found that children under the age of seven are "vulnerable," including: five and one-half years old, State v. Fisher, 108 Wash.2d 419, 739 P.2d 683 (1987); three years old, State v. Tunell, 51 Wash.App. 274, 283, 753 P.2d 543 (1988); and four years old, State v. Wood, 42 Wash.App. 78, 709 P.2d 1209 (1985).
[7] The courts have also deemed a victim "vulnerable" because the defendant is a caregiver. E.g. State v. Shephard, 53 Wash.App. 194, 201-02, 766 P.2d 467 (1988); State v. Pryor, 56 Wash. App. 107, 782 P.2d 1076 (1989).
[8] Referencing the correct offender score, DOC recommended a 480-month exceptional sentence (the sentence the trial court imposed) because:

1. The defendant's conduct during the commission of the current offenses manifested deliberate cruelty to the victim. Mr. Jennings inserted a spoon into the victim's rectum and vagina. Mr. Jennings fractured the victim's skull by hitting the victim in the back of the head. He fractured the victim's tibia by throwing her on to the bed by her legs. Mr. Jennings inserted lamp oil into the vein of the victim.
2. The defendant knew or should have known the victim of the current offenses was particularly vulnerable or incapable of resistance due to extreme youth. The victim was sixteen days old at the time of the assaults.
3. The current offenses involved domestic violence, as defined in RCW 10.99.020 and the offender's conduct during the commission of the current offenses manifested deliberate cruelty.
Clerk's Papers at 21.
[9] Grewe involved a school bus driver and an 8-year-old victim, not a parent and an infant. Nonetheless, the court noted: "Where a position of trust is abused when a child is under 14, a crime exceeding the Legislature's contemplation has been committed meriting an exceptional sentence." Grewe, 117 Wash.2d at 218, 813 P.2d 1238.
[10] Fisher, 108 Wash.2d at 424-5, 739 P.2d 683, citing D. Boerner, Sentencing In Washington § 9.6 (1985):

A particular victim's special vulnerability due to age clearly is a factor which may distinguish the crime perpetrated against him from other crimes of indecent liberties.... [T]he victim's vulnerability due to extreme youth may be a valid reason for imposing an exceptional sentence.... In this case, the victim of the offenses was only 5 ½ years old. It was reasonable for the trial court to find that his age rendered him particularly vulnerable and incapable of resistance to Fisher's actions, and that Fisher knew of his vulnerability. In other words, the record supports this finding. Moreover, the boy's vulnerability due to his extreme youth makes this crime different from other cases of indecent liberties....
[11] RCW 9A.36.011(1)(b) establishes assault in the first degree where a person "[a]dministers, exposes, or transmits to ... another, poison, ... or any other destructive or noxious substance." When he injected L.T. with lamp oil, therefore, Jennings committed an additional first degree assault, which is also included in first degree assault of a child under RCW 9A.36.120(1)(a).
[12] Most reported cases involving an assailant's injection of a substance into the victim's vein involve illegal drugs. State v. Morgan, 86 Wash. App. 74, 936 P.2d 20 (1997); People v. Silburn, 807 P.2d 1167 (Colo.Ct.App., 1990). One assault case involved injecting people with water as a hoax instead of a smallpox vaccine. People on Complaint of Burke v. Steinberg, 190 Misc. 413, 73 N.Y.S.2d 475 (N.Y.Mag.Ct.1947). Recent cases have also involved assault by injecting victim with blood tainted with HIV, State v. Stewart, 18 S.W.3d 75 (Mo.App. E.D., 2000), and murder through lethal injection of lidocaine, a drug commonly used in hospitals, People v. Diaz, 3 Cal.4th 495, 11 Cal.Rptr.2d 353, 834 P.2d 1171 (1992), as modified on denial of rehearing Oct. 21, 1992.
[13] L.T.'s attorney explained that L.T.'s doctor

described what physically occurred to L.T. as several failed attempts to kill the child, and indicated that any one of her many injuries should have killed her, and those are exact words from Dr. Wilson.
The other thing that I think made quite an impression upon me and the guardian ad litem during that interview was that you do not often hear a physician use words like miracles and miraculous, and yet this doctor was very adamant and clear that she considered the factjust the fact that L.T. survived, let alone survived as intact as she apparently has come through, as an absolute miracle. And those were her words....
Report of Proceedings at 30.
[14] "Metabolic acidosis" is defined as "decreased pH and bicarbonate concentration in the body fluids caused either by the accumulation of acids or by abnormal losses of fixed base from the body, as in diarrhea or renal disease." STEDMAN'S MEDICAL DICTIONARY 15 (26th ed.1995). "Acidosis" is defined as "[a] state characterized by actual or relative decrease of alkali in body fluids in relation to the acid content; depending on the degree of compensation for the a., the pH of body fluids may be normal or decreased; an accumulation of acid metabolites is often present, and tissue function may be disturbed (most importantly that of the central nervous system) if compensation is inadequate." STEDMAN'S MEDICAL DICTIONARY 15 (26th ed.1995)
[15] In Coats, 84 Wash.App. at 628, 929 P.2d 507, the court upheld an exceptional sentence for a defendant who stipulated that he committed 31 first degree thefts, only four of which were charged.
[16] See, e.g., State v. Armstrong, 106 Wash.2d 547, 550, 723 P.2d 1111 (1986) (defendant threw boiling coffee on child, then plunged child's foot in coffee); State v. McClure, 64 Wash.App. 528, 531, 827 P.2d 290 (1992) (stating that "focus is on acts which distinguish the crime" in a case involving repeated blows to the head); State v. Warren, 63 Wash.App. 477, 478, 820 P.2d 65 (1991) (victim shot five times), review denied, 118 Wash.2d 1030, 828 P.2d 564 (1992); State v. Cardenas, 129 Wash.2d 1, 7-8, 914 P.2d 57 (1996).
[17] Count II charged Jennings with committing the crime of first degree assault of a child by committing the crime of first degree rape of a child. First degree child rape includes the following elements: "[T]he person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim." RCW 9A.44.073.

"Sexual intercourse"
(a) has its ordinary meaning and occurs upon any penetration, however slight, and
(b) also means any penetration of the vagina or anus however slight, by an object, when committed on one person by another, whether such persons are of the same or opposite sex, except when such penetration is accomplished for medically recognized treatment or diagnostic purposes....
RCW 9A.44.010(1) (emphasis added). Here, the facts support rape ("sexual intercourse") by an objecta spoon. RCW 9A.44.010(1)(b).
[18] See part III.A. of this opinion, supra.
[19] See Counts I and II of the information, recited at page 3 of this opinion; and RCW 9A.36.120:

(1) A person eighteen years of age or older is guilty of the crime of assault of a child in the first degree if the child is under the age of thirteen and the person:
(a) Commits the crime of assault in the first degree, as defined in RCW 9A.36.011, against the child; or
(b) Intentionally assaults the child and either;
(i) Recklessly inflicts great bodily harm; or
(ii) Causes substantial bodily harm, and the person has previously engaged in a pattern or practice either of (A) assaulting the child which has resulted in bodily harm that is greater than transient physical pain or minor temporary marks, or (B) causing the child physical pain or agony that is equivalent to that produced by torture.
(2) Assault of a child in the first degree is a class A felony.